IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THERESA L. RODRIGUEZ, ZACHARY M. SHANK, MICHAEL P. MANSBERGER, HEIDI L. DETRA, and TIM CAMPBELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>HY-VEE, INC., THE BOARD OF DIRECTORS OF HY-VEE, INC., THE HY-VEE AND AFFILIATES 401(K) PLAN INVESTMENT COMMITTEE, and JOHN DOES 1-30,<br><br>Defendants. | 4:22-cv-00072-SHL-HCA<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

## I.    INTRODUCTION

Plaintiffs are participants in a 401(k) plan that they say pays too much in recordkeeping fees and includes investment options with excessive investment management fees. They sue Defendants for breach of fiduciary duty, arguing that a prudent person would have done a better job of keeping the recordkeeping fees down and removing investments with excessive management fees. Plaintiffs have provided a "meaningful benchmark" against which the recordkeeping fees can be compared and thus the Court DENIES IN PART Defendants' Motion to Dismiss. Plaintiffs have not, however, provided a "meaningful benchmark" for the allegedly excessive investment management fees, nor have they provided other necessary context to state a plausible claim for relief on that issue or the related issue of total plan costs. The Court therefore GRANTS IN PART Defendants' Motion to Dismiss.

## II.    BACKGROUND[1]

### A.  The Parties and Hy-Vee 401(k) Plan.

Defendant Hy-Vee, Inc. ("Hy-Vee"), operates grocery stores and drug stores in eight states—Illinois, Iowa, Kansas, Minnesota, Missouri, Nebraska, South Dakota, and Wisconsin.

---

[1] In ruling on the Motion to Dismiss, the Court construes the facts in the light most favorable to Plaintiffs. *See Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).

(ECF 1, ¶ 24.) Hy-Vee is the plan sponsor and a named fiduciary for the Hy-Vee and Affiliates 401(k) Plan (the "Plan"). (Id.) Hy-Vee appointed Defendant Hy-Vee and Affiliates 401(k) Plan Investment Committee and its members (the "Committee") to, among other things, ensure that appropriate investments were available for Plan participants and ensure the reasonableness of expenses for recordkeeping and administrative services. (Id., ¶ 25.) The John Doe Defendants are Hy-Vee Board Members (John Doe Nos. 1–10), members of the Committee (John Doe Nos. 11–20), and Hy-Vee officers, employees and/or contractors who are/were Plan fiduciaries (John Doe Nos. 21–30). (Id., ¶¶ 30, 34, 35.) Hy-Vee, the Committee, and John Doe Defendants 1–30 all owe fiduciary duties to Plan participants pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). (Id., ¶¶ 26, 27, 29, 33, 35.)

Plaintiffs are Plan participants who invested in the options offered by the Plan. (Id., ¶¶ 17–21.) The Plan is a "defined contribution" or "individual account" plan with the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. (Id., ¶ 43.) In general, the Plan covers all Hy-Vee employees age 19 or older. (Id., ¶ 44.) Several funds were available to Plan participants for investment each year during the putative Class Period from 2016 to present. (Id., ¶¶ 36, 52.) As of December 31, 2020, the Plan had $2,273,386,617 under management for all funds. (Id., ¶ 53.)

*B. Investment Management Fees and Total Plan Costs.*

Plaintiffs allege that Defendants breached fiduciary duties by failing to monitor the Plan to ensure there were not investments with excessive management fees. (Id., ¶ 61.) This alleged breach resulted in "several funds during the Class Period being more expensive than comparable funds found in similarly sized plans" having more than $1 billion in assets. (Id.) Retirement plan participants pay investment management expenses via the fund's expense ratio, evidenced by a percentage of assets. (Id., ¶ 62.) For example, an expense ratio of 0.75% means the participant will pay $7.50 annually for every $1,000 in assets. (Id.) The expense ratio reduces the participant's return and the compounding effect of that return. (Id.) A prudent plan fiduciary therefore must consider the effect expense ratios have on investment returns. (Id.)

To illustrate the excessive investment management fees, Plaintiffs identify seven of the Plan's funds[2], collectively having more than $298 million in assets under management in 2020. (Id., ¶ 66.) Plaintiffs compare the expense ratio for these seven funds to the median expense ratio for certain categories of funds in "similarly-sized plans" as calculated by the Investment Company Institute ("ICI"), which is an "analytical arm" of BrightScope, a "leading plan retirement industry analyst." (Id., ¶¶ 66, 70.) This comparison shows, for example, that one of the funds in the Hy-Vee Plan—the Vaughan Nelson/LA Capital/H&W SmallCap Value II Separate Account (Small Value) fund—had an expense ratio of 0.68% in 2020, in contrast to the ICI median of 0.31%. (Id., ¶ 66.) Plaintiffs characterize this expense ratio as being "***119%* above the ICI median.**" (Id.)[3] The other six example funds in the Hy-Vee Plan also had expense ratios in 2020 that were above the median in the ICI Study. (Id.) All seven funds also had 2020 expense ratios above the ICI <u>average</u> for similarly sized plans, although the disparity is smaller than when comparison is made to the ICI median. (Id., ¶ 67.)

Plaintiffs also compare the total plan costs of the Hy-Vee Plan to the total plan costs of other 401(k) plans, as calculated in an ICI Study conducted in 2018. (Id., ¶ 72.) For plans with over $1 billion in assets, the ICI Study calculated the average asset weighted total plan costs to be 0.22% of total plan assets. (Id.) As of 2019, the Hy-Vee Plan had total plan costs of 0.56%, which Plaintiffs characterize as "154% higher than average." (Id., ¶ 73.)

C. *Recordkeeping and Administrative Costs.*

Plaintiffs also allege that Defendants breached their fiduciary duties by failing to monitor the Plan to avoid excessive recordkeeping and administrative fees. (Id., ¶ 75.) Recordkeeping services are typically provided to large 401(k) plans through a "bundled" arrangement in which a single fee is charged for a range of services plus an "a la carte" arrangement in which separate, additional fees are often charged for one-off requests for services by individual plan participants. (Id., ¶¶ 77–79.) The cost of recordkeeping services often varies by the number of participants in

---

[2] The Plan has more than thirty funds in total. (ECF 14-4.)

[3] This comparison is mathematically accurate but potentially misleading. When the starting point for a comparison is low (like 0.31%), even a small change as measured by raw dollars can produce a large change on a percentage basis. For example, if a fund's expense ratio moved from .01 percent to .02 percent, this would be a "100% increase" even though it would only amount to ten extra cents per year per $1,000 invested. By contrast, as the numbers get bigger, the percentage change gets smaller, and thus a change in expense ratio from, say, ten to eleven percent would be only a "ten percent increase" yet would amount to ten extra <u>dollars</u> per year per $1,000 invested. This Order often will use percentage *points* as the basis for comparison, rather than percentage, to avoid the distortive effect of comparing small numbers on a percentage basis.

plan, with larger plans able to use economies of scale to keep per-participant recordkeeping fees lower than smaller plans. (Id., ¶ 81.) Recordkeeping expenses can be paid either directly from plan assets, indirectly by the plan's investments through a practice known as revenue sharing, or both. (Id., ¶ 82.) Revenue sharing is not per se impudent, but it can mislead participants by causing them not to realize the true costs of their investment options. (Id., ¶ 83.) Plaintiffs allege that a prudent fiduciary must identify all fees being paid to the recordkeeper, whether through direct compensation or revenue sharing (or both). (Id., ¶ 84.)

Hy-Vee Plan participants paid a flat recordkeeping charge plus revenue sharing, which Plaintiffs characterize as a "worst-case scenario" that "saddled Plan participants with above-market recordkeeping fees." (Id., ¶ 85.) Given the high fees, Plaintiffs infer that Defendants failed to conduct a Request for Proposal ("RFP") process in a prudent manner to determine whether the Plan's recordkeeping and administrative expenses were too high in relation to the general marketplace. (Id., ¶¶ 86, 87.) Plaintiffs allege that participants in the Hy-Vee Plan paid between $63.46 and $67.20 per participant between 2017 and 2020, which they characterize as "unchecked" and "excessive." (Id., ¶¶ 88, 89.) They compare Principal, the recordkeeper for the Hy-Vee Plan, to Fidelity, another nationally recognized recordkeeper. (Id., ¶ 92.) Fidelity stipulated in a lawsuit in the District of Massachusetts that the value of recordkeeping services it provided to a large plan was $14 to $21 per year. (Id., ¶¶ 93, 94.) Plaintiffs allege that the demographics of the Hy-Vee Plan compare favorably to those of the Fidelity plan and thus Defendants "could have negotiated for recordkeeping and administration fees as low as $14 and up to $21 per participant in recordkeeping and administration fees." (Id., ¶ 95.) Plaintiffs further allege that the per participant fees in seven other "comparable" plans show fees in the range of $21 to $34 per participant in 2019 for plans with more than 30,000 participants and more than $2 billion under management. (Id., ¶ 96.) Given the size of the Hy-Vee Plan, Plaintiffs allege that the Plan's fiduciaries should have been able to negotiate recordkeeping fees "from $14 per participant to the mid $20 range from the beginning of the Class Period to the present, but certainly should not have paid more than $35 per participant at worst." (Id.)

D.  *Alleged Breaches of Fiduciary Duty.*

Plaintiffs allege that the Committee and its members breached fiduciary duties by failing to engage in an appropriate and prudent process to avoid excessive investment management fees and recordkeeping and administration costs. (Id., ¶¶ 102, 103.) Plaintiffs allege that Hy-Vee and

4

its Board of Directors breached fiduciary duties by failing to monitor the Committee to ensure it avoided those same excessive fees and costs. (Id., ¶¶ 109–112.) Plaintiffs allege that Defendants' breaches of fiduciary duty proximately caused millions of dollars in losses to the Plan. (Id., ¶¶ 104, 112.) Plaintiffs seek to have a class of similarly situated individuals certified pursuant to Fed. R. Civ. P. 23(b)(1) or 23(b)(2). (Id., p. 30.) Plaintiffs seek actual damages, injunctive relief, attorney's fees, costs, and other forms of relief. (Id., pp. 30–32.) Defendants move to dismiss for failure to state a claim. (ECF 14.) The Court held oral argument on September 21, 2022. (ECF 39.)

## III.   LEGAL STANDARDS

"ERISA imposes upon fiduciaries twin duties of loyalty and prudence, requiring them to act 'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use…'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting 29 U.S.C § 1104(a)(1)). The prudent person standard "is an objective standard . . . that focuses on the fiduciary's conduct preceding the challenged decision." *Id.* (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)).

To state a claim for breach of fiduciary duty, "a plaintiff must make a prima facie showing that the defendant acted as a fiduciary, breached its fiduciary duties, and thereby caused a loss to the Plan." *Id.* at 594. "To survive a motion to dismiss, a complaint must contain 'sufficient factual matter' to state a facially plausible claim for relief." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Factual matter is sufficient where it "raise[s] a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). All reasonable inferences must be drawn in Plaintiffs' favor. *Davis*, 960 F.3d at 483. "Plausibility depends on the 'totality of the specific allegations in each case.'" *Id.* at 484 (quoting *Braden*, 588 F.3d at 596 n.7) (cleaned up).

"Even in a defined-contribution plan where participants choose their investments . . . plan fiduciaries must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Northwestern Univ.*, 142 S.Ct. 737, 742 (2022) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)). "A fiduciary can breach its duty of prudence if it fails to monitor and remove imprudent investment options." *Davis*, 960 F.3d at 484 (citing *Tibble*, 575 U.S. 523). "It is no defense to simply offer a 'reasonable array'

of options that includes some good ones . . . and then 'shift[]' the responsibility to plan participants to find them." *Id.* (cleaned up) (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 335–36 (8th Cir. 2014) and *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009)).

In an investment-by-investment challenge, "a complaint cannot simply make a bare allegation that costs are too high, or returns are too low." *Id.* Instead, "a plaintiff must provide a sound basis for comparison—a meaningful benchmark." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). In *Braden*, a combination of a "market index and other shares of the *same* fund" met this requirement, but there is "no one-size-fits-all approach." *Matousek v. MidAmerican Energy Co.*, --- F.4th ----, 2022 WL 6880771, at *4 (8th Cir. Oct. 12, 2022) (quoting *Meiners*, 898 F.3d at 822). Likewise, a "meaningful benchmark" is required in claims for breach of fiduciary duty based on excessive recordkeeping fees or total plan costs. *Id.* at *2.

## IV.   LEGAL ANALYSIS

### A.   *The Complaint Fails to State a Claim for Breach of Fiduciary Duty Based on Excessive Investment Management Fees.*

Plaintiffs' Complaint identifies seven funds out of more than thirty in the Hy-Vee Plan that allegedly have excessive investment management fees, as measured against the median and average level of fees charged in "similarly-sized" 401(k) plans according to an ICI Study. To determine whether these allegations state a plausible claim for breach of fiduciary duty, the Court must decide whether Plaintiffs have "provide[d] a sound basis for comparison—a meaningful benchmark." *Meiners*, 898 F.3d at 822. The Court concludes they have not.

#### 1.   The ICI Study Is Not a Meaningful Benchmark for the Funds Identified by Plaintiffs as Having Allegedly Excessive Investment Management Fees.

The ICI Study is the only benchmark provided by Plaintiffs to support their allegation that Defendants breached fiduciary duties by allowing the Hy-Vee Plan to include investment options with excessive investment management fees. At the outset, the Court rejects Plaintiffs' argument that the appropriateness of a proposed benchmark is better left for summary judgment on a more complete record. The Eighth Circuit has held that the analysis may be performed at the motion to dismiss stage. *See Matousek*, 2022 WL 6880771, at *4 (affirming dismissal for failure to state a claim following careful analysis of proffered benchmark); *Davis*, 960 F.3d at 484–85 (same).

Similarly, based on Eighth Circuit precedent, the Court does not agree with Plaintiffs' position that the ICI Study and other documents embraced by the Complaint "may only be considered for the fact that they contain a statement therein but not to prove the truth of the

statement." (ECF 26, p. 13 (quoting *Savage v. Sutherland Global Servs., Inc.*, 2021 WL 726788, at *2 (W.D.N.Y. Feb. 25, 2021) (quoting *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017).) The Eighth Circuit has held that district courts may "look at matters outside the pleadings if those matters are necessarily embraced by the pleadings." *Meiners*, 898 F.3d at 823. In doing so, the Eighth Circuit has gone further than merely accepting "the fact that [the documents embraced by the pleadings] contain a statement" and instead has presumed the accuracy of those statements. *See, e.g.*, *Matousek*, 2022 WL 6880771, at *2–3 (using information in Form 5500s and other industry and plan documents to decide motion to dismiss); *Davis*, 960 F.3d at 484 (same). Admittedly, this process of analyzing hundreds of pages of documents that were not attached to the pleading may test the boundaries of Fed. R. Civ. P. 12(b)(6). It is nonetheless appropriate in an ERISA case because it ensures the plaintiff's factual allegations—which are accepted as true—are being considered in the proper context to determine whether they state a plausible claim for relief. *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (describing motions to dismiss as an "important mechanism for weeding out meritless claims" under ERISA for which "the appropriate inquiry will necessarily be context specific").

Turning to the merits, courts have reached differing conclusions about whether the ICI Study is an appropriate benchmark. Plaintiffs cite out-of-circuit cases denying motions to dismiss when plaintiffs used the ICI Study as a benchmark. *See, e.g.*, *Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2021 WL 1212579, at *7 (E.D. Mich. Mar. 31, 2021) (denying motion to dismiss and concluding that arguments about the merits of the ICI Study as a comparator "are premature in a motion to dismiss"); *Pinnell v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020) (denying motion to dismiss because the plaintiffs "plausibly pled numerous and specific factual allegations comparing the Plan's investment options to similar lower-cost alternatives"). Defendants, by contrast, cite in- and out-of-circuit cases reaching the opposite conclusion. *See, e.g.*, *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303 (D. Minn. 2021) ("[T]he ICI Study median expense ratios are not meaningful benchmarks."); *Rosenkranz v. Altru Health Sys.*, No. 3:20-CV-168, 2021 WL 5868960, at *10 (D.N.D. Dec. 10, 2021) (concluding ICI Study is not a meaningful benchmark). The Court interprets Eighth Circuit precedent as requiring an investment-by-investment analysis of whether the ICI Study is an appropriate benchmark, as opposed to a categorical conclusion one way or the other. *See Matousek*,

2022 WL 6880771, at *4 (engaging in one-by-one analysis); *cf. Hughes*, 142 S. Ct. at 740 ("[A] categorical rule is inconsistent with the context-specific inquiry that ERISA requires…").

One of the problems with the ICI Study is that it calculates median expense ratios without differentiating between actively and passively managed mutual funds even though the former are generally more expensive than the latter. (*See* ECF 14-9, p. 62 ("[A]ctively managed mutual funds can offer investors the chance to earn superior returns, access specialized sectors, or take advantage of alternative investment strategies, all of which can make a mutual fund more expensive to manage.").) Under Eighth Circuit precedent, the difference matters. *See Davis*, 960 F.3d at 484–85 (comparing costs of actively and passively managed funds is "[c]omparing apples and oranges"); *see also Parmer*, 518 F. Supp. 3d at 1303. Similarly, the ICI Study apparently did not have actual data on investment management fees for collective investment trusts ("CITs") and pooled separate accounts and therefore had to estimate fees for those types of investments using an algorithm. (ECF 14-9, p. 53.) This, again, limits the Study's usefulness as a benchmark.

The shortcomings of the ICI Study as a benchmark are on full display here. Six of the seven funds identified by Plaintiffs as having excessive investment management fees are CITs or pooled separate accounts: (1) the ClearBridge Large Cap Growth CIT Class R2 fund managed by Clearbridge Investments (the "ClearBridge Fund"); (2) the U.S. Property Sep[arate] Acc[oun]t fund managed by Principal Real Estate Inv[estors] (The "Principal U.S. Property Fund"); (3) the MidCap Value I Separate Account fund managed by LA Capital Mgmt/Victory (the "LA Capital MidCap Fund"); (4) the SmallCap Value II Separate Account fund managed by Vaughan Nelson/LA Capital/H&W (the "Vaughan Nelson Small Cap Fund"); (5) the International I Separate Account fund managed by Origin Asset Management LLP (the "Origin International Fund"); and (6) the SmallCap Growth I Separate Account managed by AB/Brown/Emerald (the "AB SmallCap Fund"). This means Plaintiffs have proposed a benchmark—the ICI Study—that does not even have actual data for the types of investments against which Plaintiffs want the benchmark to be compared. This is reason enough to conclude the proposed benchmark is not "meaningful."

Moreover, most of the CITs and pooled separate accounts identified by Plaintiffs as having excessive investment management fees appear to be actively managed—or, at least, are clearly not akin to the passively managed mutual funds that cause a downward skew to the median and average calculations in the ICI Study. For example, the Investment Option Summary for the ClearBridge

Fund says the managers' strategy is to find "leadership companies where they believe the market price underestimates the magnitude of future growth." (ECF 14-4, p. 18.) This requires subjective determinations by active managers. Similarly, the Investment Option Summary for the Principal U.S. Property Fund says it "focuses on properties anticipated to return both lease income and appreciation of the buildings' marketable value," which, again, would require active management. (Id., p. 24.) Finally, the Investment Option Summaries for the LA Capital MidCap Fund, the Vaughan Nelson Small Cap Fund, and the Origin International Fund each describes a strategy of "buying equity securities that appear to be undervalued." (Id., pp. 19, 20, 23.) This, too, is language one would associate with actively managed funds. It is inappropriate to compare the costs of these actively managed (and therefore presumably more expensive) funds against the ICI Study median, which includes cheaper, passively managed funds. *See Davis*, 960 F.3d at 484–85. It is not an apples-to-apples comparison. *Id.*

There is only one fund in Plaintiffs' group of seven that is not a CIT or pooled separate account: the American Funds New World R6 Fund managed by Capital Research and Mgmt Co (the "Capital Research New World Fund"). This Fund also, however, appears to be actively managed, as the Investment Option Summary says the managers' strategy is to find companies with "significant exposure to countries with developing economies and/or markets." (ECF 14-4, p. 22.) Thus, again, the ICI Study is not an appropriate benchmark. *Davis*, 960 F.3d at 484–85.

    2.   <u>Fund Performance Data Reinforces the Conclusion that Plaintiffs Have Failed to State a Claim.</u>

The invalidity of the ICI Study as a benchmark is not the only reason Plaintiffs' Complaint fails to state a claim related to excessive investment management fees for the seven funds. The Complaint also fails because most of the seven funds performed at a high enough level relative to benchmarks to more than counterbalance the allegedly excessive fees. In other words, Plan participants were generally better off by having those funds as options than they would have been with a benchmark fund that charged investment management fees at the ICI Study median.

In their Complaint, Plaintiffs do not mention anything about the performance of the seven funds, instead focusing entirely on fees. This is a notable omission, as a prudent fiduciary reasonably might decide to include higher-fee options in the menu of choices for plan participants if those options were reasonably likely to produce higher returns. After all, a reasonable investor presumably would pay higher fees in exchange for even higher returns. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1165 (6th Cir. 2022) ("[T]here is nothing wrong with permitting employees

to choose [more expensive options] in hopes of realizing above-average returns over the course of the long lifespan of a retirement account.").

Careful analysis of the AB SmallCap Fund documents illustrates the point. (ECF 14-4, p 21.) Plaintiffs allege it had an expense ratio "that was ***106%*** above the ICI median," and therefore Defendants breached their fiduciary duties by making it available to Plan participants. (ECF 26, p. 14 (emphasis in original).). However, as of the quarter ending March 31, 2021, the AB SmallCap Fund had three-year investment returns almost four percentage points higher than a benchmark fund, the Russell 2000 Growth Index. (ECF 14-4, p. 21.) This means Hy-Vee Plan participants were better off by investing their money in the AB SmallCap Fund (despite the higher fees) than if they invested in the benchmark fund with investment management fees at the ICI median.

The math is important. According to Plaintiffs, the AB SmallCap Growth I Fund charged investment management fees of 0.64% in 2020, which equates to $6.40 per $1,000 invested. (ECF 1, ¶ 66.) By contrast, according to Plaintiffs and the ICI Study, the median investment management fee for "similarly-sized plans" was 0.31%, or $3.10 per $1,000 invested. (Id.) So a Plan participant in the Hy-Vee Plan paid $3.30 more than the median level of fees each year for each $1,000 invested in the AB SmallCap Growth I Fund.[4]

What did the Plan participant get for these extra fees? As of March 31, 2021, the AB SmallCap Growth I Fund produced three-year annual returns of 22.01%, which equates to $220.10 per year per $1,000 invested. (ECF 14-4, p. 21.) By contrast, investors in the Fund's benchmark, the Russell 2000 Growth Index, had three-year annual returns of 17.16%, which equates to $171.60 per year per $1,000 invested. (Id.) Meaning: a Hy-Vee Plan participant who chose to invest in the AB SmallCap Growth I fund earned almost $50 extra per year per $1,000 invested for the three-year period ending March 31, 2021, as compared to someone who invested in the benchmark fund. This is far more than $3.30 in extra fees the participant would have paid per year during the same period as compared to the ICI Study median.[5]

---

[4] Plaintiffs' Complaint frames the issue by comparing, on a percentage basis, the expense ratio for the AB SmallCap Fund to the median expense ratio from the ICI Study. This is mathematically correct and allows Plaintiffs to allege, with bold and italicized font for emphasis, that the expense ratio "was ***106%*** above the ICI median." Framing the issue in this way is also, however, somewhat misleading, as it masks the fact that the extra fees, expressed in raw dollars, amount to only $3.30 per $1,000 invested.
[5] To borrow Plaintiffs' framing, the extra returns are more than 1,600 percent higher than the $3.30 in extra fees the participant would have paid.

When viewed with this context, and even setting aside the validity of the ICI Study as a benchmark, Plaintiffs have clearly failed to state a claim for breach of fiduciary duty based on Defendants' failure to remove the AB SmallCap Fund from the menu of available options to Hy-Vee Plan participants. Removing this Fund from the Plan and replacing it with the benchmark fund would have caused participants to be <u>worse off</u> even if the benchmark plan charged investment management fees at the ICI Study median. Indeed, Plan participants would have been worse off even if the benchmark fund charged no investment management fees at all. The "context specific" inquiry therefore shows that Defendants did not breach their fiduciary duties by not removing the AB SmallCap Fund (or, if they did, that Plan participants suffered no damages). *Dudenhoeffer*, 573 U.S. at 425.

The numbers are even more stark with respect to the Capital Research New World Fund. Plaintiffs allege that it had an expense ratio of 0.60%, or $6.00 per $1,000 invested, in comparison to the ICI Study median expense ratio for International Equity funds of 0.49%, or $4.90 per $1,000 invested. (ECF 1, ¶ 66.) In other words, participants who invested in this Fund paid an extra $1.10 in investment management fees per $1,000 invested. As of the quarter ending March 31, 2021, however, the Capital Research New World Fund experienced three-year annual returns of 11.99%, which is more than five-and-one-half percentage points higher than the 6.48% in annual returns for the Fund's benchmark, the MSCI Emerging Markets NR Index. (ECF 14-4, p. 22.) This means investors in the Capital Research New World Fund experienced returns of $119.90 per year per $1,000 invested, in contrast to investors in the benchmark fund, who experienced returns of $64.80 per $1,000 invested. Or: investors received $55.10 in extra returns per year per $1,000 invested in exchange for paying $1.10 in extra fees. Any rational Plan participant would be happy with this tradeoff, and thus Defendants did not act as imprudent fiduciaries by making it available to participants in the Hy-Vee Plan. *See Smith*, 37 F.4th at 1165 (holding that fiduciaries do not act imprudently by offering choices to plan participants).

Several other funds from the group of seven identified by Plaintiffs as having excessive investment management fees also outperformed benchmark funds by a sufficient degree to outweigh the extra investment management fees. The LA Capital MidCap Fund experienced three-year returns nearly two percentage points higher than a benchmark fund for the quarter ending March 31, 2021. (ECF 14-4, p. 19.) The Origin International Fund experienced three-year returns nearly one percentage point higher than a benchmark fund for the same period (and five-year

returns nearly two percentage points higher). (Id., p. 23.) The Principal U.S. Property Fund experienced five-year returns nearly one percentage point higher than a benchmark fund for the period ending December 31, 2020. (Id., p. 24.)[6] These extra returns outweigh the extra fees, and thus Plaintiffs have failed to state a claim for relief with respect to these funds regardless of whether the ICI Study is an appropriate benchmark.

None of this is to suggest that fund performance is the only thing that matters in the breach of fiduciary duty analysis. *See Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [other options] were an imprudent choice at the outset."). Fund performance (or, more precisely, underperformance) is, however, "a building block for a claim of imprudence." *Smith*, 37 F.4th at 1167. Here, the "building block" serves only to undermine Plaintiffs' allegations. It follows that Plaintiffs have failed to state a claim.

There are only two funds in the Hy-Vee Plan that allegedly had excessive investment management fees and failed to produce high enough returns relative to benchmark to outweigh the extra fees: the ClearBridge Fund and Vaughan Nelson SmallCap Fund. Even these funds performed reasonably close to their benchmarks, however, and thus Plaintiffs likely would not have stated a claim for breach of fiduciary duty with respect to them even if the Complaint contained a meaningful benchmark. *See Davis*, 960 F.3d at 485 ("[I]t is not imprudent for a fiduciary to provide both [active and passive] options."); *Smith*, 37 F.4th at 1165. Given Plaintiffs' failure to provide a meaningful benchmark, however, the question is academic. Dismissal is appropriate regardless. The Court therefore GRANTS IN PART Defendants' Motion to Dismiss and dismisses the claims against all Defendants arising out of allegedly excessive management fees.

*B. The Complaint Fails to State a Claim for Breach of Fiduciary Duty Based on Allegedly Excessive Total Plan Costs.*

For similar reasons, the Court concludes the Complaint fails to provide an appropriate benchmark to support the allegation that the total plan costs in the Hy-Vee Plan are excessive. The only proffered benchmark is, again, the ICI Study, which shows that plans with more than $1 billion in assets have average total weighted plan costs of 0.22% of total plan assets, in contrast to

---

[6] The Investment Option Summary for this fund does not provide a benchmark for three-year returns, nor does it provide a benchmark for returns as of the quarter ending March 31, 2021. (Id.)

the total weighted plan cost of 0.56% for the Hy-Vee Plan. (ECF 1, ¶¶ 70–73.) The ICI Study includes, however, a wide range of investment options, from inexpensive and passively managed mutual fund indexes to more expensive and actively managed mutual fund, CIT, and separate account funds. (ECF 14-9, p. 18.) It is impossible to conclude, simply by looking at an industry wide average, whether the mix of options in the Hy-Vee Plan are priced too high, too low, or just right in relation to the options offered by the Plan's peers. (Id. ("[The ICI Study] is not intended for benchmarking the costs of specific plans to the broad averages presented here.").); *see also Matousek*, 2022 WL 6880771, at *3 (rejecting industry-wide averages as a benchmark due to "mismatch" with the specific plan in question). The Court therefore GRANTS IN PART Defendants' Motion to Dismiss and dismisses the claims against all Defendants arising out of allegedly excessive total plan costs.

C. *The Complaint States a Plausible Claim for Breach of Fiduciary Duty with Respect to Recordkeeping Fees.*

The final issue is the allegedly excessive fees charged by the Hy-Vee Plan's recordkeeper, Principal Life Insurance Company ("Principal"). The Court's analysis of this issue is complicated by a disagreement between the parties on an important underlying fact: the amount of fees as calculated on a per participant basis. Plaintiffs' Complaint alleges that recordkeeping fees were between $63.46 and $67.20 per participant per year from 2017 to 2020. (ECF 1, ¶ 88.) Plaintiffs' calculation appears to derive from the Form 5500s for the Hy-Vee Plan, which include a box for "direct compensation paid by the plan" to Principal, as Contract Administrator. (*See, e.g.*, ECF 14-3, p. 4.) In 2019, by way of example, the Form 5500 lists "direct compensation" to Principal of $3,397,973. (Id.) Plaintiffs divide this figure (and the corresponding figures from other years) by the number of Plan participants in each year to yield the recordkeeping fee range of $63.46 to $67.20 per year per participant. (ECF 1, ¶ 88.)

Defendants argue there is a mathematical error in this calculation, and the actual recordkeeping fees were only approximately $43.27 per participant in 2019. (ECF 14-1, p. 23 (relying on ECF 14-7, p. 3).) The source for Defendants' argument is a plan document from August 2019 stating that the charge for administrative and recordkeeping services "will be reduced from 0.11% to 0.10% effective October 1, 2019." (ECF 14-7, p. 1.) Starting with the total amount of assets in the Plan as of December 31, 2019 (around $2.3 billion), Defendants use the 0.10% figure to calculate total recordkeeping fees for the year 2019. (ECF 14-1, p. 23, fn. 17.) Then, they divide

this total by 52,543 participants to yield the result of $43.27 per person. (Id.) Plaintiffs do not concede the mathematical error. (ECF 26, p. 24.)[7]

At this stage, the Court cannot accept Defendants' contention that the recordkeeping fees were only approximately $43.27 per participant per year. As their own math errors illustrate, the analysis Defendants want the Court to undertake depends on calculations and assumptions that are neither easy to make nor obvious from the face of Plaintiffs' Complaint or the documents embraced therein. This type of analysis is not appropriate on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), where "inferences are to be drawn in favor of the non-moving party." *Braden*, 588 F.3d at 595. Defendants fail to persuasively explain, for example, why the Court should conclude as a matter of law that recordkeeping and administrative fees were only $2,273,386.61 in the year 2019 even though the Form 5500 for the Plan says Principal was paid $3,397,973 that year. At most, Defendants are asking the Court to resolve disputed inferences in their favor, which the Court cannot do. *See id.* Similarly, although Defendants cite Plan documents for the proposition that "[a]ny revenue sharing received from the Plan's investment options will be credited back in full to the impacted participant as a Fee Adjustment . . . either monthly or quarterly" (e.g., ECF 14-4, p. 2), they have not provided the Court enough information to understand what this means or how it affects per participant recordkeeping fees. For present purposes, the Court must accept as true that recordkeeping fees during the relevant period were $63 to $67 per participant per year.

Having reached this conclusion, the Court must decide whether Plaintiffs have provided a "meaningful benchmark" against which those recordkeeping fees can be compared. Plaintiffs attempt to do so by identifying seven "Comparable" 401(k) plans with recordkeeping fees between $21 and $34 per year, as well as a stipulation from Fidelity in litigation in the District of Massachusetts that the value of recordkeeping services provided to plan participants was somewhere between $14 and $21 per participant per year starting in 2014. (ECF 1, ¶¶ 93, 94, 96.) Plaintiffs also identify several relatively recent cases in which evidence was offered (sometimes by an expert for plaintiffs) that the market rate for recordkeeping fees was as low as $18 and no

---

[7] Ironically, Defendants made several mathematical errors of their own in calculating the $43.27 figure, including multiplying total assets by .010 (it should have been .001), getting the product wrong when the two numbers were multiplied together (they said the product was $227,338.661, but it should have been $22,733,866.10 if total assets were incorrectly multiplied by .010 (as they purported to do), or $2,273,386.61 if total assets were correctly multiplied by .001), and getting the quotient wrong when they divided $227,338.661 by 52,543 participants (based on Defendants' numbers, the quotient should have been $4.327, not $43.27). (ECF 14-1, p. 23, fn. 17.)

higher than $45 per participant per year. (ECF 1, ¶ 97 & fn. 14.) Defendants, in turn, offer several arguments for why these are not appropriate benchmarks.

Defendants' arguments are largely unpersuasive. Defendants complain, for example, that Plaintiffs' seven comparators range in size from 31,000 to 48,000 participants with assets ranging from "over $3 billion to nearly *$11 billion*," in contrast to the Hy-Vee Plan, which allegedly had "$1.6-$2.1 billion in assets between 2016 and 2020 with approximately 46,000 to 52,000 participants." (ECF 14-1, p. 18 (emphasis in original).)[8] The Court cannot conclude, at the pleading stage, that these relatively modest differences are enough to defeat the plausibility of Plaintiffs' claim. Indeed, according to Page 7 of the ICI Study, only 0.1% of 401(k) plans had more than $1 billion in assets and more than 10,000 participants in 2018. (ECF 14-9, p. 13.) Given this limited universe of comparator options, Plaintiffs' Complaint does not become implausible simply because it identifies plans that are not exact enough in size compared to the Hy-Vee Plan. *See Parmer*, 518 F. Supp. 3d at 1307 (denying motion to dismiss as to recordkeeping fees where plaintiffs alleged "that the recordkeeping fees far surpass the market rate for those services").

Defendants also argue the Complaint fails to state a claim because it identifies only the seven comparator plans even though there are approximately 600,000 total 401(k) plans in the United States. (ECF 14-1, p. 17.) Defendants argue that "[t]he fees from that miniscule number of plans cannot create an inference that the Plan's fees were outside the range of 'reasonable judgments' fiduciaries may make." (Id.) In context, this argument is incredibly weak. In the very next page of their Brief, as described above, Defendants argue that the seven comparator plans (all of which had $2.6 billion-plus in assets and 30,000-plus participants) are not close enough in size to the Hy-Vee Plan to be meaningful benchmarks. It is inconsistent for Defendants, on the one hand, to criticize Plaintiffs for not picking the right comparators from the limited universe (0.1%) of large 401(k) plans with more than $1 billion in assets and 10,000 participants, yet also criticize them for not picking enough comparators based on the entire universe of 401(k) plans, the overwhelming majority (99.9%+) of which are far smaller than the Hy-Vee Plan.

---

[8] Once again, Defendants' Brief contains errors. The smallest comparator in Plaintiffs' Complaint in terms of asset size is The Rite Aid 401(k) Plan, which is reported to have $2,668,142,111 in assets under management. (ECF 1, ¶ 96.) This is not, as Defendants contend, "over $3 billion." Moreover, as Defendants themselves acknowledge elsewhere, the Hy-Vee Plan had almost $2.3 billion in assets under management by the end of 2019 (ECF 14-3, p. 7), which is obviously more than "$1.6-$2.1 billion."

Defendants' inconsistency is troubling. Defendants and *Amicus Curiae* argue that there are too many ERISA breach of fiduciary duty lawsuits being filed across the country, most or all of which are simply cut-and-paste jobs in which plaintiffs' counsel cherry pick a few data points from a particular plan but otherwise rely heavily on boilerplate allegations. As *Amicus Curiae* puts it, the "complaints typically follow a familiar playbook, often loaded with legal conclusions but few factual allegations specific to the plan at issue." (ECF 29, p. 3.) These are legitimate concerns! But they are undermined by the fact that defense counsel are obviously following a "playbook," too, in which, as far as the Court can tell, they indiscriminately file motions to dismiss in every case and have no qualms (at least here) about raising internally inconsistent arguments in the process. Defendants are, in effect, asking courts on a one-by-one basis to adopt a categorical approach to ERISA breach of fiduciary duty lawsuits despite the Supreme Court's conclusion that such categorical approaches are inappropriate. *See Hughes*, 142 S. Ct. at 740.

In any event, the crux of the dispute here is whether Plaintiffs have done enough to nudge their pleading across the plausibility line by identifying seven large comparator plans with substantially lower recordkeeping fees than the Hy-Vee Plan and providing bits and pieces of other information to the effect that fees should be no higher than $35 (or maybe $45) per participant. The Court concludes they have. The sheer difference in recordkeeping fees between the $63 to $67 per participant allegedly charged in the Hy-Vee Plan and the $21 to $35 charged in other large plans is an important starting point, as it supports (although it does not, in and of itself, establish) the inference that Defendants failed to monitor recordkeeping costs. Moreover, while Defendants ultimately may prove correct that the seven comparator plans and other evidence have been cherry picked or are not representative of recordkeeping costs across the industry in plans like Hy-Vee's, this is "one plausible inference, but it is not the only one." *Davis*, 960 F.3d at 483 (holding, in part, that plaintiff stated a plausible claim for breach of fiduciary duty).

The fact that the seven comparator plans only include "direct" costs in the calculation of recordkeeping fees—in contrast to the Hy-Vee Plan, for which Plaintiffs' Complaint includes direct <u>and</u> indirect costs—is also not a persuasive reason to dismiss the Complaint. The Complaint alleges that direct costs comprise the overwhelming majority of recordkeeping fees paid by the Hy-Vee Plan; for example, in 2020, direct costs were $3,397,973, while indirect costs were only $14,706. (ECF 1, ¶ 88.) It follows that even if the indirect costs are removed from the calculation, the recordkeeping fees remain approximately the same on a per participant basis. In 2020,

recordkeeping fees were $64.95 if direct and indirect costs are both included versus $64.67 if only direct costs are included. This small difference is not enough to conclude Plaintiffs have not plausibly stated a claim for relief.

Finally, although the issue is closer, Defendants have not convinced the Court that potential differences in the scope of services offered by Hy-Vee's recordkeeper versus those offered in the comparator plans is a reason to conclude the comparators are not meaningful benchmarks. Defendants argue that the Complaint "says nothing about the recordkeeping services provided to the Plan" (ECF 14-1, p. 21), but this is incorrect: Plaintiffs' Complaint goes into detail describing the recordkeeping services "provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan)" (ECF 1, ¶ 77). It may prove to be the case that the recordkeeper for the Hy-Vee Plan provided a broader range or higher quality of services, thus justifying higher fees, but Defendants have not given the Court enough information at this stage to reach such a conclusion as a matter of law. *See Davis*, 960 F.3d at 483. Instead, the Court must accept as true the Complaint's allegation that all recordkeepers in large plans provide the same range of services. This allegation, when considered in conjunction with: (a) specific allegations that other large plans charge fees substantially lower than those charged by the recordkeeper for the Hy-Vee Plan; (b) other allegations about market rates for recordkeeping fees in large plans; and (c) allegations that large plans like Hy-Vee have sufficient bargaining power to drive fees down, is enough to allow an inference that Defendants did not do enough to keep recordkeeping fees under control. *See, e.g.*, *Braden*, 588 F.3d at 595–96 (holding that plaintiff stated claim based on plan's alleged failure to use its large size to make sure lower-cost investment options were available to participants); *Parmer*, 518 F. Supp. 3d at 1307 (denying motion to dismiss where plaintiffs alleged the "recordkeeping fees far surpass the market rate" and "superior or comparable recordkeeper plans were available"); *Rosenkranz*, No. 3:20-CV-168, 2021 WL 5868960, at *11 (denying motion to dismiss where plaintiffs alleged "the size of the Plan's assets and number of participants qualified it for lower-cost recordkeeping services"). This, in turn, is sufficient to state a claim for breach of fiduciary duty, notwithstanding Defendants' argument that Plaintiffs should have provided more detail about the recordkeeping services provided in the Hy-Vee Plan vis-à-vis the comparators. *See Braden*, 588 F.3d at 595 ("The district court erred in two ways. It ignored reasonable inferences supported by the facts alleged. It also drew inferences in [defendants'] favor, faulting [plaintiff] for failing to plead facts tending to contradict those inferences.").

The Eighth Circuit's recent decision in *Matousek* is not to the contrary. In *Matousek*, the defendants gave the Court enough information to allow it to identify the types of services provided by the recordkeeper and calculate the approximate fees for each type. *See, e.g.*, 2022 WL 6880771, at *2–3 (using participant-disclosure forms to calculate fees of $32 to $48 per participant for "basic recordkeeping services"). The Court then compared the fees for those services to the industry-wide benchmarks proffered by the plaintiffs, concluding the plan in question "compares favorably" to the benchmarks once an apples-to-apples comparison was performed. *See id.* at *3.

Unlike *Matousek*, Defendants here have not given the Court enough information to understand the difference (if there is one) in the scope of recordkeeping services provided in connection with the Hy-Vee Plan versus those provided in the proffered benchmarks. In other words, Defendants have given the Court no reason to doubt the plausibility of Plaintiffs' allegation that "all" recordkeepers in large 401(k) plans provide the same suite of recordkeeping services, and thus the Hy-Vee Plan paid too much. *See Davis*, 960 F.3d at 483 (requiring competing inferences to be resolved in favor of the non-moving party). Moreover, Plaintiffs here filled a gap identified by the Eighth Circuit in *Matousek* by offering evidence of "the fees paid by other specific, comparably sized plans." *Id.* at *3. When these comparators are considered in conjunction with Plaintiffs' other anecdotal and industry-wide allegations regarding market rates for recordkeeping fees in large plans, as well as allegations that larger plans like Hy-Vee's have greater bargaining power and should be able to negotiate for lower fees (ECF 1, ¶¶ 93–98), Plaintiffs have done enough state a plausible claim. *See Davis*, 960 F.3d at 483; *Braden*, 588 F.3d at 595–96; *Parmer*, 518 F. Supp. 3d at 1307; *Rosenkranz*, No. 3:20-CV-168, 2021 WL 5868960, at *11. The Court therefore DENIES IN PART Defendants' Motion to Dismiss.

> D. *The Court Rejects Plaintiffs' Attempt to Characterize Their Case as Revolving Around One, Unified Breach of Fiduciary Duty Theory.*

One issue remains, and it may have important implications for discovery. In their Motion to Dismiss, Defendants characterize Plaintiffs' Complaint as having three distinct theories: (1) excessive investment management fees; (2) excessive total plan costs; and (3) excessive recordkeeping fees. Plaintiffs resist this characterization, arguing in their Brief and at oral argument that there is a single, unified breach of fiduciary duty theory for which these are simply three examples. (*See, e.g.*, ECF 41, p. 22 ("Defendants are taking those allegations as three different theories . . . we want the Court to look at all three theories together as more evidence that

this is the plan where the fiduciaries were not doing their job to reduce costs for the plan participants.").)

The Court rejects Plaintiffs' framing of the case. By granting in part the motion to dismiss, the Court has concluded Plaintiffs have not stated a plausible claim for relief on the issues of investment management fees and total plan costs. The Court expects the parties to conduct discovery in a way that honors this conclusion—i.e., that focuses solely on the narrow issue of recordkeeping fees.

## V.      CONCLUSION

Plaintiffs' Complaint fails to state a claim for breach of fiduciary duty based on the allegedly excessive investment management fees and total plan costs. The Complaint does state a claim, however, for breach of fiduciary duty based on allegedly excessive recordkeeping fees. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.


**IT IS SO ORDERED.**


Dated: October 21, 2022

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE