IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THERESA L. RODRIGUEZ, ZACHARY M. SHANK, MICHAEL P. MANSBERGER, HEIDI L. DETRA, and TIM CAMPBELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>HY-VEE, INC., THE BOARD OF DIRECTORS OF HY-VEE, INC., THE HY-VEE AND AFFILIATES 401(K) PLAN INVESTMENT COMMITTEE, and JOHN DOES 1-30,<br><br>Defendants. | 4:22-cv-00072-SHL-WPK<br><br><br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT** |

## I.    INTRODUCTION

Defendants are fiduciaries of a 401(k) plan that, between 2016 and 2022, substantially reduced the recordkeeping fees charged to plan participants. Nonetheless, Plaintiffs accuse Defendants of breaching their fiduciary duties, arguing that a prudent fiduciary would have achieved even greater fee reductions. The Court concludes that Plaintiffs have not adduced sufficient evidence to allow a reasonable factfinder to conclude Defendants failed to act in a reasonably prudent manner, and thus GRANTS Defendants' Motion for Summary Judgment.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

*A.  The Hy-Vee 401(k) Plan.*

Hy-Vee operates more than 285 retail grocery stores in Iowa and neighboring states. (ECF 90-1[2], ¶ 1.) Hy-Vee sponsors the Hy-Vee and Affiliates 401(k) Plan (the "Plan") as a way for employees to save for retirement. (Id., ¶ 2.) The Plan is a defined contribution or individual account

---

[1] The facts set forth in this section are either undisputed or viewed in the light most favorable to Plaintiffs, as the non-moving party. *See Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018) ("In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party.").

[2] In Plaintiffs' Response to Defendants' Statement of Facts, Plaintiffs sometimes admit facts by reference to the corresponding paragraph number of Defendants' Statement of Facts, but without re-stating the substance of the fact itself. (See, e.g., ECF 90-1, p. 3 (admitting ¶¶ 1–28).) The Court will nevertheless cite only to Plaintiffs' Response, even though the parties will have to cross-reference Defendants' Statement of Facts to review the substance. (See, e.g., ECF 87-2, ¶¶ 1–28.) The Court will only provide parallel citations if necessary to explain areas of disagreement.

plan. (Id., ¶ 3.) Throughout the class period, Principal Life Insurance Company ("Principal") served as the Plan's recordkeeping and administrative service provider. (Id., ¶ 45.) The recordkeeping fees charged by Principal are at the center of the parties' dispute.

Plan participants can choose to invest their contributions in one or more of approximately thirty investment options. (Id., ¶ 4.) Eligible employees are automatically enrolled in the Plan and contribute three percent of their pay unless they choose a different contribution percentage. (Id., ¶ 5.) Hy-Vee makes matching employer contributions. (Id., ¶ 6.) At the end of the 2021 Plan year, there were 57,780 Plan participants with account balances, and the Plan held more than $2.2 billion in assets. (Id., ¶ 7.) By contrast, there were 46,231 Plan participants and $1.62 billion in assets as of 2016. (ECF 98, ¶ 235.)

The Plan identifies Hy-Vee as the Named Fiduciary and Plan Administrator and gives Hy-Vee discretionary authority for administration and oversight. (ECF 90-1, ¶ 15.) The Plan allows for some expenses, including those for recordkeeping and other administrative services, to be paid out of Plan assets. (Id., ¶ 17.) The Plan delegates some authority to the Hy-Vee and Affiliates 401(k) Plan Investment Committee (the "Committee"). (Id., ¶ 16.) Hy-Vee has delegated its authority for reviewing Plan fees and expenses to the Committee. (Id., ¶ 18.) The Hy-Vee Board of Directors appoints members of the Committee on an annual basis. (Id., ¶ 19.) The Committee is primarily composed of top Hy-Vee executives. (Id., ¶ 20.) The Committee is governed by a Charter that describes its duties and responsibilities, some of which may be delegated to subcommittees. (Id., ¶¶ 24–25.) Once such subcommittee is the Investment Subcommittee. (Id., ¶ 26.)

The Committee met two to four times per year during the class period (essentially from 2016 to 2023[3]), and the Investment Subcommittee met three to four additional times during the same period. (Id., ¶ 30.) Minutes were taken at each Committee and Investment Subcommittee meeting. (Id., ¶¶ 31, 34.) In advance of each Committee and Investment Subcommittee meeting, members received an agenda, minutes from the prior meeting, and supporting materials. (Id., ¶¶ 32, 35.) The parties dispute how the Committee handled the issue of recordkeeping fees, with Defendants asserting that the Committee as a whole made decisions about fees while Plaintiffs

---

[3] The class period is technically defined as running from March 1, 2016, to the date of judgment. (ECF 66, p. 4.) Because discovery closed in 2023, however, the summary judgment record primarily includes information from 2016 through 2022.

assert that decisions were made almost entirely by past and present Chief Financial Officers Michael ("Mike") Skokan and Andy Schreiner, respectively. (Id., ¶¶ 22–23, 33.)

In any event, the Committee provided an update to the Board of Directors every year, as required by the Charter. (Id., ¶¶ 37–38.) Recordkeeping fees were discussed at seven Board meetings between 2016 and 2022, although Plaintiffs dispute the substance of those discussions, including whether and to what extent the Committee negotiated fees with Principal. (Id., ¶ 39.) The parties similarly dispute whether the Committee relied on Board members' knowledge to inform decision-making as to recordkeeping fees. (Id., ¶ 40.)

All members of the Committee are either members of the Board or attend Board meetings. (Id., ¶ 41.) The Board received annual fiduciary duty training during the class period. (Id., ¶ 42.) The Committee and Investment Subcommittee also regularly received information about their fiduciary responsibilities, as well as legal and regulatory developments affecting retirement plans, from Principal and independent consultant DeMarche Associates, Inc. ("DeMarche"). (Id., ¶ 43.) This occurred at thirteen meetings between May 2016 and December 2022. (Id.)

As the Plan's recordkeeping and administrative service provider, Principal assigns a dedicated relationship manager, client services manager, and education strategist to the Plan. (Id., ¶ 48.) There are quarterly meetings between Hy-Vee and Principal representatives to discuss Plan-related issues, including services, programs, and certain fees. (Id., ¶¶ 185–89.) Skokan testified that he attempts "at every turn" to have conversations about lowering fees, although Plaintiffs dispute the accuracy of this testimony. (Id., ¶¶ 190–91.) Lacey Hilton-Loewe, Principal's Senior Relationship Director, and Skokan have discussed recordkeeping fees at times, although Plaintiffs dispute how often those discussions occurred and whether they led to suitable reductions in fees. (Id., ¶¶ 73, 191–95.) Regardless, it is undisputed that Hy-Vee's recordkeeping fees per Plan participant have fallen from a high of $92.64 in 2007 to $36.93 as of March 31, 2021. (Id., ¶ 197.)

There was discussion of some sort about fees during an Investment Subcommittee meeting in October 2016. (Id., ¶ 198; see also ECF 87-3, pp. 282–83, 382–411.) Fees were discussed again at a meeting in November 2019, when either Skokan or the entire Investment Subcommittee considered moving to a flat fee structure. (ECF 90-1, ¶ 199.) According to the meeting minutes, Skokan said moving to a flat fee would reduce the fee for larger members but increase the fee for young investors. (Id.)

*B.   The Impact of Hy-Vee's Employee-Owned Status on Plan Administration.*

Hy-Vee is employee-owned, and the Plan requires services relating to the Hy-Vee Stock Fund. (Id., ¶¶ 82–83.) The parties dispute whether and to what degree the employer stock component of the Plan adds complexity to Plan administration. (Id., ¶¶ 84, 86.) It is undisputed, however, that because Hy-Vee's stock is privately held, the stock value is based on book value. (Id., ¶ 85.) To determine the stock price, there is an annual "true-up process." (Id., ¶ 86.) However, Plaintiffs assert that the stock valuation process is, at least in part, an investment process that is unrelated to this litigation. (Id.)

A portion of the matching contributions made by Hy-Vee to the Plan are directed to the Hy-Vee Stock Fund. (Id., ¶ 87.) Principal must calculate and allocate the matching contribution for each of the thousands of Plan participants who receive one. (Id., ¶ 88.) In addition, in connection with the annual match process, there is a "put" whereby the Hy-Vee stock is liquidated and reallocated. (Id., ¶ 89.) Principal works directly with the manager of the Stock Fund on this process because the Plan cannot own more than a specific percentage of outstanding shares of Hy-Vee stock. (Id., ¶ 90.) Other Principal recordkeeping clients have employer stock, but none of them require an annual put process. (Id., ¶ 91.) During the annual match and put process, it is crucial for there to be coordination between Hy-Vee, Principal, and the Stock Fund manager to ensure participant contributions are valued properly in accordance with the book value of Hy-Vee stock. (Id., ¶ 92.) Principal performs additional Plan and participant validation on the back end. (Id., ¶ 93.) To be eligible for matching contributions, a participant must be actively employed on the last day of the Plan year, which Principal must monitor. (Id., ¶ 94.) In the 2022 Plan year, for example, roughly 14,600 of the 28,000 newly eligible employees in the Plan were terminated as of the last day of the Plan year and therefore ineligible for matching. (Id., ¶ 95.)

*C.   The Impact of Hy-Vee's Employee Demographics on Plan Administration.*

Hy-Vee has a fairly transient employee population consisting of, *inter alia*, employees who work only one day per week, seasonal workers, college students who may work only during breaks, employees who quit without notice, and others who may leave one store for another or work in two different locations. (Id., ¶ 112.) Hy-Vee hires thousands of new employees every year, and there are corresponding Plan enrollment requirements that Principal must satisfy. (Id., ¶ 114.) For example, there is dual automatic enrollment based on the different ages at which full-time and part-time employees are eligible to participate in the Plan. (Id., ¶ 115.) Principal must track and

reconcile information about employee movement and attrition as part of the services it performs for the Plan. (Id., ¶ 113.) Principal also conducts an automatic enrollment sweep analysis for full-time employees who contribute less than three percent of their pay. (Id., ¶ 116.) Principal also prepares material for government reporting and performs compliance testing and audit support, including analyzing the match and potential refund for highly compensated employees. (Id., ¶ 117–18.) Principal performs custom reporting, including a monthly fee report, transaction and demographic reports, distribution report, forfeiture report, and loan report, as well as providing consulting services related to plan design, mergers and acquisitions, participant loans, and other analyses. (Id., ¶¶ 119–20.) Hy-Vee requires Principal to coordinate with Hy-Vee's internal auditors and IT department regarding data integrity and data synchronization. (Id., ¶ 121.) Principal coordinates the creation of custom reports for these projects, which occur throughout the year. (Id., ¶ 122.)

Principal processed over 34,000 participant terminations for the 2022 Plan Year. (Id., ¶ 96.) In addition, the Stock Plan has transactional restrictions for participants that require coding and monitoring by Principal. (Id., ¶ 97.) Principal also provides custom monthly reports relating to the Stock Fund and a variety of payroll services. (Id., ¶¶ 98–99.)

   D.  *Administrative Challenges Associated with the Hy-Vee Plan.*

During the class period, Hy-Vee and seven affiliated companies participated in the Plan, including Midwest Heritage Bank, D&D Foods, Florist Distributors, Perishable Distributors, Hy-Vee Construction, Hy-Vee A+, and Hy-Vee Pharmacy Solutions & Amber Pharmacy. (Id., ¶ 100.) Hy-Vee itself submits two payroll files—one staff and store payroll file and one store employee payroll file—to Principal, each at different times. (Id., ¶¶ 101–02.) Currently, the staff and store payroll file is furnished monthly, and the store employee payroll file is submitted weekly (although it was submitted bi-weekly prior to 2022). (Id., ¶ 104.) Until 2023, Hy-Vee also gave Principal an executive payroll file that Principal had to manually load into its system. (Id., ¶ 103.) Hy-Vee affiliates submit their own separate payroll files in varying formats. (Id., ¶ 105.) The affiliates use various payroll processing software, and some upload their files directly to Principal's website, in contrast to Hy-Vee's custom file upload and download process. (Id., ¶ 107.) As a result, there are "[m]ultiple frequencies and methods of data remittance . . . including web upload, FTP files and manually loaded spreadsheets." (Id., ¶ 108.) According to Principal, these large files require "numerous resources to process." (Id., ¶ 109.)

Hy-Vee used in-house payroll until 2022, when it converted to Workday. (Id., ¶ 106.) To the extent Principal performed work in connection with this conversion—which Plaintiffs dispute—Principal did not charge for it. (Id., ¶ 110.) Affiliate payroll files are submitted separately via upload to the Principal website. (Id., ¶ 111.)

   E.  *The Plan's Recordkeeping Fees and Fee Structure.*

The Plan pays a recordkeeping fee for Principal's recordkeeping and administrative services, measured as a percentage of assets invested in the Plan. (Id., ¶ 123.) Recordkeeping fees are deducted directly from each participant's account as a percentage of that participant's account balance. (Id., ¶ 124.)

Prior to September 2016, Hy-Vee used a "levelized revenue sharing process" in which Principal collected revenue sharing from funds/separate accounts and then debited or credited each participant with an amount designed to net the final recordkeeping fee. (Id., ¶ 125.) Plaintiffs dispute whether Principal credited an appropriate amount to each participant. (Id.) Regardless, the Plan transitioned to a "zero-revenue-sharing" model effective September 28, 2016. (Id., ¶¶ 126, 128.) Under this model, all of the Plan investment options with a share class that did not generate revenue sharing were implemented. (Id., ¶ 127.) The only exceptions were the Stable Value Fund and Principal Stock Account, for which Principal credited the revenue sharing to the Plan participants who invested in that fund. (Id., ¶¶ 128–29.) Effective November 15, 2021, Hy-Vee elected to close the Principal Stock Account, with the remaining assets defaulted to the Plan's applicable target date collective investment trust option. (Id., ¶ 130.) As a result, there is effectively zero revenue sharing in the Plan. (Id., ¶ 131.) In addition, for many investment options affiliated with Principal, Principal provides an investment credit for fees that returns to the participant a portion of the fund's expense ratio pro rata based on the fair market value of each investment option in the participant's account. (Id., ¶ 132.) This is a separately negotiated credit applicable to the Hy-Vee Plan and very few other Principal clients. (Id., ¶ 133.)

There was some reduction in the Plan's recordkeeping fee between March 2016 and January 2021, although the parties dispute the size of the reduction and how it came into existence. (Id., ¶ 134.) Part of the reduction related to a fee associated with services provided by Wilshire Associates Incorporated ("Wilshire"). (Id., ¶¶ 135–37.) Wilshire provided investment advisory services and Principal added one basis point annually onto total Plan assets to pay Wilshire's fee. (Id., ¶¶ 135–36; see also ECF 87-21, pp. 1070–71.) Principal listed Wilshire's fee as part of its

asset-based fee even though Wilshire didn't provide recordkeeping services, although Plaintiffs point out that to the extent Wilshire analyzed investment costs on a "net" basis, it reviewed the amount of revenue share used to pay recordkeeping fees. (ECF 90-1, ¶ 137.) Regardless, the one basis point was effectively tacked on to the recordkeeping fees Principal charged the Plan. (ECF 90-3, p. 63 ("So, in reality, our recordkeeping fee is 10bps + 1bps for the Wilshire Service = 11bps.").) Hy-Vee terminated Wilshire's advisory services effective January 1, 2021. (ECF 90-1, ¶ 138.)

Hy-Vee paid for DeMarche's 401(k) consulting services out of corporate assets and without charging the Plan. (Id., ¶ 141.) Principal did not refer DeMarche to Hy-Vee. (Id., ¶ 142.) The Committee relied on DeMarche as an independent source to help evaluate fees. (Id., ¶ 143.) The Committee met with DeMarche every year to review recordkeeping fees, investment fees, and total Plan fees. (Id., ¶ 144.) The parties dispute whether and to what extent DeMarche provided information and recommendations relating to recordkeeping fees and other Plan fees. (Id., ¶¶ 145–46.) Regardless, Principal provided Annual Plan Reviews to the Committee and Investment Subcommittee that addressed recordkeeping services and fees, among other topics. (Id., ¶ 147.) The topic of recordkeeping fees and/or Principal's services was addressed at twenty different Committee and/or Investment Subcommittee meetings between 2016 and 2022, although the parties dispute the extent of the discussion at these meetings. (Id., ¶ 150.) Plaintiffs assert that the Committee did not generally discuss recordkeeping fees as a group, but rather Skokan would simply update the Committee on fees. (Id., ¶ 151.)

On October 31, 2017, Loewe (from Principal) presented an annual review to the Investment Subcommittee describing Principal's recordkeeping fees as "below benchmark," although Plaintiffs dispute the accuracy of her description. (Id., ¶ 152.) In an Investment Subcommittee meeting in May 2019, Skokan asked Loewe if increased efficiencies and economies of scale from Principal's acquisition of the Wells Fargo Institutional Retirement and Trust would result in a reduction of fees. (Id., ¶ 153.) During a Committee meeting in October 2019, there was again discussion about fees, with Skokan identifying three potential strategies for reducing fees: (1) removing Wilshire; (2) removing a program known as Retire Secure (described in detail below); and/or (3) going paperless. (Id., ¶ 154.) The Committee declined (1) and (2) but agreed to a change that would require employees to opt out of electronic statements. (Id.) The topic of reducing fees

by going paperless was also raised at an Investment Subcommittee meeting in November 2019. (Id., ¶ 155.)

    *F. Hy-Vee's Request for Information in Late 2019/Early 2020.*

    In October 2019, Skokan contacted DeMarche to ask for a Request for Information ("RFI") for recordkeeping services, which had last occurred in 2012. (Id., ¶¶ 205, 207.) DeMarche did not advise the Committee or Investment Subcommittee to perform a Request for Proposal ("RFP") rather than RFI, although Skokan and Loewe both viewed the RFI as essentially the same as an RFP due to the level of detail in the RFI. (Id., ¶¶ 209, 211–13.)

    As part of the RFI, Hy-Vee requested recordkeeping proposals on both a flat fee (per-participant) and percentage fee (asset-based) basis. (Id., ¶¶ 200, 214.) In its RFI Report and Recommendations, DeMarche explained that a per-participant fee can be a problem in the retail industry due to turnover and smaller employee balances; in other words, many employees end up paying a higher percentage under a per-participant fee model. (Id., ¶ 201.) DeMarche concluded that either an asset-based or per-participant model would be appropriate. (Id., ¶ 202.) Either Skokan or the entire Committee ultimately decided that the asset-based structure was the most appropriate for the Plan due to the number of participants with small balances. (Id., ¶ 204.)

    The RFI was distributed to eleven recordkeepers, all of whom were asked dozens of questions about their experience, services, processes, and fees, among other topics. (Id., ¶¶ 215–16.) One of the recordkeepers, Vanguard, declined to respond to the RFI because there were "administrative challenges" associated with Hy-Vee's Plan and Vanguard was "unable to provide the service model that Hy-Vee is accustomed to with Principal." (Id., ¶ 217.) Four recordkeepers—Empower, T. Rowe Price, Bank of America Merrill Lynch, and Prudential—declined to respond to the RFI due to concerns about the privately-held stock component of Hy-Vee's Plan. (Id., ¶¶ 218, 222.) Fidelity declined to respond to the RFI because of concerns that it "could not offer a competitive bid given Principal was 'bending over backward' to accommodate and provide custom solutions." (Id., ¶ 219.) Similarly, Charles Schwab declined to respond to the RFI because the project was "too challenging." (Id., ¶ 220.) Alight declined to submit a response to the RFI because it did not view Hy-Vee as a "traditional client" due to the use of proprietary funds and the on-site representation by the financial services provider. (Id., ¶ 221.)

    Only three recordkeepers, including Principal, responded to the RFI. (Id., ¶ 223.) Milliman proposed an asset-based fee of 11.5 basis points, or $51 per participant. (Id., ¶ 224.) Milliman also

indicated that there would be additional charges for custom programming. (Id., ¶ 225.) Principal proposed an asset-based fee of 9 basis points, or $42 per participant. (Id., ¶ 226.) Voya proposed an asset-based fee of approximately 6 basis points, or $26 to $29 per participant, depending on whether Hy-Vee would adopt certain Voya funds. (Id., ¶ 227.) Voya's quote "assumed slightly fewer on-site annual meetings and did not include mailing/postage." (Id., ¶ 228.) When DeMarche adjusted Voya's bid to account for additional costs such as postage and Retire Secure meetings, it concluded the true bid was somewhere between 7.25 and 8 basis points. (Id., ¶ 229; see also ECF 90-2, p. 78.) DeMarche also adjusted Milliman's bid upward, to 12 basis points, to account for travel costs that had not been included in the proposed price. (ECF 90-1, ¶ 230.)

DeMarche evaluated all three proposals, noting that Principal provided many custom services to the Plan. (Id., ¶ 231.) DeMarche said the main purpose of the RFI would be to determine whether Principal's fees were competitive, but the Plan would need to be careful to make sure the competitors were offering the same services as Principal. (Id., ¶¶ 157, 210.) DeMarche ultimately recommended retaining Principal. (Id., ¶ 232.) Hy-Vee agreed and decided to retain Principal. (Id., ¶ 233.) Through the RFI, Principal's fees were reduced from 9 basis points to 8 based on the removal of the Wilshire service. (Id., ¶ 234.)

At a Committee meeting in November 2020, Loewe discussed the reduced recordkeeping fee that resulted from the RFI. (Id., ¶ 158.) At a Committee meeting in November 2021, the Committee discussed additional steps resulting in a reduction in recordkeeping fees. (Id., ¶ 159.) The topic of reducing fees through removing physical mailings came up during a Committee meeting in August 2022. (Id., ¶ 160.)

G. *Benchmarking Reports.*

Between 2018 and 2022, Hy-Vee obtained six separate fee benchmarking reports for the Plan from a company called Fiduciary Decisions, which may or may not have been independent from Principal. (Id., ¶ 161.) Principal has an agreement with Fiduciary Decisions whereby Principal provides anonymized plan-level data for all of its clients, in exchange for which Principal is given access to a Fiduciary Decisions database that allows Principal to benchmark its plans against plans for other recordkeepers. (Id., ¶¶ 162–63.) In its benchmarking reports, Fiduciary Decisions analyzed the Plan's recordkeeping services and fees against other plans determined by Fiduciary Decisions to be the "Benchmark Group." (Id., ¶ 169.) Each of the six benchmarking reports from Fiduciary Duties showed the Plan's recordkeeping fees to be lower than the

benchmark. (Id., ¶¶ 172, 196.) Plaintiffs dispute, however, that the benchmarking reports were accurate or reliable. (Id.) In any event, the benchmarking results were provided to the Committee and Investment Subcommittee beginning in November 2019. (Id., ¶ 173.) In addition, Skokan shared the reports with DeMarche. (Id., ¶ 174.)  Currently, Principal performs benchmarking analyses twice per year using the Fiduciary Decisions database. (Id., ¶ 175.)

Principal provided compensation disclosures to Hy-Vee throughout the class period that included information about recordkeeping fees and participant transaction fees. (Id., ¶¶ 176–77.) The Investment Subcommittee was informed about these fees annually. (Id., ¶ 178.) In addition, Skokan received monthly reporting from Principal about recordkeeping fees, although the parties dispute the extent to which Skokan reviewed and reconciled this information. (Id., ¶ 179.) Whatever the merits of this dispute, it is undisputed that on at least one occasion, in August 2020, Skokan raised an issue to Principal's attention regarding an improper failure to apply credits to participant accounts. (Id., ¶¶ 183–84.) This led to the discovery of a programming error and retroactive credits. (Id., ¶ 184.)

 Since becoming Chair of the Committee, Schreiner receives and reviews these reports. (Id., ¶ 180.) The monthly expense reports list the Plan's investment options, fees charged by those options (inclusive of both management fees and recordkeeping/administrative fees), and the amounts credited to Plan participants as investment credits. (Id., ¶ 181.) Loewe could not identify any other Principal recordkeeping client who requested the same level of detailed fee and expense reporting during her twenty-plus years with Principal. (Id., ¶ 182.)

*H.   The Retire Secure Program and Other Educational Services.*

One of the disputed issues between the parties revolves around the "Retire Secure" program that Principal provides as part of its Plan administration services. The Retire Secure program consists of three full-time dedicated Principal representatives who travel to Hy-Vee's 285 locations across eight states to hold in-person, one-on-one meetings with Hy-Vee employees about the Plan. (Id., ¶ 50.) Through these meetings, Retire Secure provides information about Principal's 401(k) plans. (Id., ¶ 51.) The parties dispute the extent to which Retire Secure provides services beyond those offered in connection with other 401(k) plans, as well as the extent to which Hy-Vee employees take advantage of the opportunity for one-on-one meetings. (Id., ¶¶ 52–55.) Between April 2015 and December 2016, for example, Principal representatives held 4,206 one-on-one meetings with Plan participants, which is slightly less than one meeting per ten Plan participants

based on the number of participants during that time. (Id., ¶ 60.) The numbers were similar from 2017 to 2019. (Id., ¶ 61.) In 2019 and 2020, 1,656 and 1,620 Plan participants, respectively, used Retire Secure for meetings out of over 52,000 total Plan participants. (Id., ¶ 62.) In 2021 and 2022, Principal representatives met with 2,642 and 2,139 Plan participants, respectively. (Id., ¶ 63.) The parties disagree about how to interpret this evidence: Defendants characterize Retire Secure as offering significant value to Plan participants, while Plaintiffs argue that it adds little value at all. (E.g., id., ¶¶ 52–56, 64.) Regardless, the parties agree that the cost of the Retire Secure program is part of the Plan's recordkeeping fee paid to Principal. (Id., ¶ 57.)

Principal is not allowed to cross-sell other products during Retire Secure meetings, and the meetings are advertised well in advance to try to encourage employee participation. (Id., ¶¶ 58–59.) In 2020, the Plan Sponsor Council of America awarded the Plan third place nationally in the financial wellness category. (Id., ¶ 65.) According to the Plan Sponsor Council of America, Hy-Vee communicated with Plan participants by holding webinars and one-on-one meetings with Principal, promoting the program in various ways, and otherwise created a program that resonated with the target audience. (Id., ¶ 66.) The Plan Sponsor Council of America concluded that more than 7,000 employees and 800 spouses viewed a webinar or attended a meeting, representing thirty-two percent of the target audience. (Id.) DeMarche described the level of on-site education in the Retire Secure program as "not typical within the industry, although not a total outlier…" (Id., ¶ 67.) The on-site Retire Secure meetings differentiate the Hy-Vee Plan from other Principal recordkeeping clients. (Id., ¶ 68.)

The Committee and Investment Subcommittee received regular reports from Principal about the Retire Secure program. (Id., ¶ 69.) The parties dispute the extent to which the Committee and Investment Subcommittee "evaluated" the Retire Secure program, although meeting minutes indicate that at some point Skokan said the program was "very expensive" and "barely utilized." (Id.) The Retire Secure program was discussed at twelve Committee and Investment Subcommittee meetings during the class period. (Id., ¶ 71.) In 2016, there was discussion at a Committee meeting about how the Retire Secure program costs two-and-one-half basis points in fees, which was characterized as a "heavy expense given how little the team is utilized by the Plan participants." (ECF 98, ¶ 255.) The minutes further state: "Following discussion, the Committee decided to keep the Retire Secure program in place and to work harder at employee awareness." (Id.) In 2019, the Committee again decided to retain the Retire Secure program despite discussion that it could be

removed to "further trim administrative fees." (Id., ¶ 256.) The Retire Secure program was also discussed at quarterly Plan administrative meetings, which were attended by the Committee Chair and another Hy-Vee executive, as well as Principal representatives including Loewe. (ECF 90-1, ¶ 73.) Principal provided metrics at these meetings regarding the number of one-on-one meetings, as well as information regarding the number of new Plan participants, average deferral percentage of those participants, number of Plan participants who increased their deferral contribution, and the average deferral percentage increase. (Id., ¶ 74.) In 2020, there was discussion with the Committee of what would happen if the Retire Secure program were to be eliminated and replaced with webinars. (ECF 98, ¶ 258.)

In addition to the Retire Secure program, Principal provided other educational services to Hy-Vee, including the Healthy Lifestyles Program Campaign. (ECF 90-1, ¶ 75.) The campaign was designed to bring "a financial wellness arm to the Hy-Vee Healthy Lifestyles wellness program." (Id., ¶ 76.) In 2019, Principal expanded the program to include "financial wellness education" webinars. (Id., ¶ 77.) Principal also provided customized participant communications, including annual notice and investment change mailings, quarterly custom posters, customized wording on participant statements and the Plan website, customized Plan enrollment materials and distribution letters, and hard-copy enrollment kits. (Id., ¶ 78.) The hard-copy enrollment kits were intended for Hy-Vee employees who work on the store floor and do not have access to a Company-provided computer. (Id., ¶ 79.) Principal did not separately charge Hy-Vee beyond the normal recordkeeping fee for certain custom communications. (Id., ¶ 80.)

   *I.   Grounds for Plaintiffs' Breach of Fiduciary Duty Claims.*

According to Plaintiffs' expert, Veronica Bray, the Hy-Vee Plan is a "mega-plan" whose size affects the cost of recordkeeping services. (Id., ¶¶ 237, 239.) Many recordkeeping services are necessary for all defined contribution plans, regardless of asset size or participant size, and thus there is no inherent reason why the fees for those services should grow as asset size increases. (Id., ¶¶ 240–41.) In Bray's opinion, the services provided to the Hy-Vee Plan are in line with services for other large, mega-plans. (Id., ¶ 242.)

DeMarche was retained to provide services on a variety of issues relating to the Plan. (ECF 98, ¶ 263.) Bray has no experience with DeMarche as a consultant for 401(k) plans. (ECF 90-1, ¶ 243.) In 2017, Principal reported that DeMarche appeared to be providing the same or similar level of due diligence review and other services to the Plan that were also being provided through the

Wilshire service. (ECF 98, ¶ 264.) Accordingly, Principal said Wilshire's service might not be needed and was not used by Principal's other large clients. (Id.) The Wilshire service was nonetheless retained until September 2020, when it was again recommended for removal due to its services being "duplicative of what DeMarche provides." (Id., ¶ 265.) The same year, DeMarche reported that Hy-Vee was one of only two large plan clients using the Wilshire service. (Id., ¶ 266.) The parties dispute whether Wilshire played a role in analyzing recordkeeping fees, but it is undisputed that there was discussion at a Committee meeting in 2019 about how the removal of Wilshire's service and removal of the Retire Secure program would help reduce recordkeeping fees. (Id., ¶¶ 267–68.)

Hy-Vee did not necessarily have a formal orientation process for new Committee members, although Skokan might sit down with them to discuss their responsibilities. (Id., ¶ 239.)[4] There was no specific annual fiduciary training for Committee members, although many of those members were members of the Board as well and would have gone through fiduciary training at the Board level. (Id., ¶ 240.) The formal fiduciary training for the Board was conducted by Principal, not DeMarche. (Id., ¶ 241.)

Victor Roberts is Hy-Vee's Director of Financial Reporting and 401(k) Plan administrator. (ECF 90-1, ¶ 73.) Roberts testified that he generally did not get involved with recordkeeping fees, as this was the province of CFO Skokan. (ECF 98, ¶ 243.) Roberts is not familiar with revenue sharing as it relates to the Plan. (Id., ¶ 245.)

The Plan's Investment Policy statement did not address recordkeeping fees. (Id., ¶ 246.) Both sides' experts agree that ERISA requires plan fiduciaries to understand fees and ensure reasonableness. (Id., ¶ 247.) The Hy-Vee Plan did not have a Fee Policy Statement ("FPS") or a formal documented process for monitoring fees beyond the monitoring that occurred during Committee and Investment Subcommittee meetings. (Id., ¶ 248.) According to Bray, a prudent fiduciary would have implemented an FPS. (Id., ¶ 249.)

Although Defendants cite the complexity of Hy-Vee's payroll system as a reason for higher recordkeeping costs, Bray opines that it was Hy-Vee itself—not Principal—who handled much of the complexity like payroll uploads, providing data, and overseeing payroll. (Id., ¶¶ 269–71.) Moreover, Defendants' own expert, Dylan Mosby, agreed that other plans have multiple payrolls

---

[4] Plaintiffs inadvertently used paragraph numbers 239 through 243 twice in their Counterstatement of Material Facts, and thus those paragraph numbers are repeated twice here.

and private company stock, which he conceded did not have costs separate and apart from the overall cost of recordkeeping. (Id., ¶¶ 272–73.)

As it relates to benchmarking, Plaintiffs, through Bray, assert that Hy-Vee or Principal fed inaccurate or misleading information into the Fiduciary Decisions database and therefore received "skewed" results that made Principal's recordkeeping fees appear more reasonable than they were. (Id., ¶¶ 275–82.) For example, the Fiduciary Decisions report categorized "Determining Newly Eligibles"—i.e., the process of assessing whether an employee is eligible to participate in the Plan—as a "large cost impact" item even though Principal arguably treats this as a "core service" for which no additional cost is assessed to the Plan. (Id., ¶ 275.) Similarly, the Fiduciary Decisions report categorized the calculation of an employer match for a 401(k) plan as a "medium cost impact" even though Principal treats "year-end match" as a "core service." (Id., ¶ 276.) Plaintiffs allege similar discrepancies for the calculation of employer profit sharing and services associated with investments in the company's own stock, which are characterized in the Fiduciary Decisions report as "small cost impact" and "large cost impact," respectively, but are part of the "core services" provided by Principal at no extra cost. (Id., ¶ 277.) Likewise for "top heavy testing" and "410(b)," which are categorized as "medium cost impact" and "large cost impact," respectively, but are listed as "core services" by Principal. (Id., ¶ 278.) According to Plaintiffs, neither Loewe, Skokan, or the Committee recognized that the Fiduciary Decisions benchmarking report was based on inaccurate characterizations of these six services. (ECF 90-1, ¶ 279.) Furthermore, in Bray's opinion, it is common for those six services to be included as standard services without additional cost. (Id., ¶ 280.)

Plaintiffs further suggest that Hy-Vee did not perform benchmarking often enough. (Id., ¶ 281.) Between 2012 and 2020, for example, Plaintiffs allege that "the Committee relied on the skewed benchmark [from 2012] for Plan comparison information." (Id., ¶ 282.) Defendants deny the accuracy of this allegation and point out that Skokan testified to continually monitoring fees through that period. (ECF 98, ¶ 282.) Regardless, it is undisputed that Hy-Vee did not conduct an RFI between 2012 and 2020. (Id.) Similarly, the Committee went more than five years—between 2016 and 2022—without performing a "Full Plan Review." (Id., ¶ 313.)

In 2016, the recordkeeping fee went down by two basis points due to growth in Plan assets and an increase in participants. (Id., ¶ 289.) In 2017, the recordkeeping fee was reduced by one basis point due to changes to some Plan services. (Id., ¶ 285.) In 2018, the recordkeeping fee

remained the same. (Id., ¶ 286.) According to a benchmark report from Principal dated January 30, 2018, the Plan's assets were between the Medium and High range and the participants were above the High range when compared to other plans, yet the fee was above the 25th percentile. (Id., ¶ 283.) The report identified total plan assets, participants, and plan average account balances as "drivers" of the recordkeeping fees. (Id.) In 2019, the recordkeeping fee was reduced by one basis point by increasing fees for distributions and loans. (Id., ¶ 287.) In 2020, the recordkeeping fee did not change, although it did change effective January 1, 2021. (Id., ¶ 288.) Although recordkeeping fees went down between 2016 and 2020, Plaintiffs assert that the reduction was not the result of effective negotiations by the Committee; for example, in Bray's opinion, the Committee did not negotiate lower recordkeeping fees for receiving the same services or by leveraging the Plan's size and use of Principal products. (ECF 90-1, ¶¶ 290–91.)

Plaintiffs offer various criticisms of the 2020 RFI process. First, they assert that the Committee should have issued a Request for Proposal ("RFP") rather than (or in addition to) an RFI because an RFP is more comprehensive and sometimes will lead to better pricing. (Id., ¶¶ 295–301.) According to Plaintiffs, the RFI was not as robust as it could have been. (Id., ¶¶ 301, 303.) Plaintiffs also criticize the Committee for not following up more aggressively with potential bidders. (Id., ¶¶ 292, 305–06.) For example, DeMarche did not recommend negotiations with Milliman to try to lower Milliman's bid, nor did DeMarche recognize the value associated with Milliman's "blended collection model," which could have removed fees for participants with smaller account balances. (ECF 98, ¶¶ 292, 310.) Moreover, although some RFI recipients like Alight and Fidelity decided not to respond, they indicated they were "open to conversation" or interested in moving to the RFP stage, but there was no follow up. (Id., ¶¶ 305–06.)

After the RFI, Skokan informed the Committee that some 401(k) plans were moving to a hybrid fee structure in which fees are charged partly as a flat fee and partly as a percentage. (Id., ¶ 312.) Skokan allegedly did not, however, tell the Committee that Principal could use this fee structure or provide Hy-Vee with alternative fee structure scenarios. (Id.) Although Skokan testified to performing monthly reconciliations of recordkeeping fees, he did not keep an Excel spreadsheet or similar electronic file with his reconciliations, nor did he forward them (or the underlying expense reports) to the Investment Subcommittee. (Id., ¶¶ 250–51.)

In Bray's opinion, had Defendants adhered to the fiduciary standard of care, the Plan could have achieved recordkeeping fees ranging from $26 to $29 per participant. (ECF 90-1, ¶ 314.) Her

opinion is based on her experience working with similar plans, a review of the Plan's services, and a database of mega-plans she uses or has access to in her outside professional business. (Id.) Bray included four examples of other mega-plans receiving services similar to those in the Hy-Vee Plan and for which recordkeeping fees are allegedly lower, including: The Hershey Company 401k Plan; ADT Security Corporation Retirement Savings & Investment Plan; The Savings & Investment Plan (WPP Group USA); and SAP America, Inc. 401(k) Plan. (ECF 98, ¶ 315.) Hershey, WPP Group, and SAP America utilized Vanguard for recordkeeping services, and ADT utilized Fidelity. (ECF 90-2, pp. 167–70.)

Defendants offer numerous criticisms of Bray's methodology and conclusions, including that she: (a) failed to explain how she selected the four plans as comparators; (b) did not disclose the database from which she selected the plans; (c) failed to compare the recordkeeping services provided by the comparators to those provided by Principal; (d) excluded "indirect" fees from her calculations; and (e) calculated the comparator fees for only a single year of the class period and without respect to whether the Plan paid more in fees than the four comparators for any other year. (ECF 98, ¶ 315.) In response to these criticisms, Bray identified the documents on which she relied to make comparisons about services (ECF 90-1, ¶ 329) and explained why she excluded certain years of information about comparator fees (id., ¶¶ 330–32).

Bray's initial expert report calculated damages of $13.2 to $14.2 million to the Plan during the class period. (ECF 90-2, pp. 29–30.) In her rebuttal report, however, she made a downward adjustment to the Plan's per-participant fee, resulting in a lower damages calculation. (*Compare* id., p. 20 *with* ECF 90-3, p. 122.) Plaintiffs do not provide her exact final number, although they allege it is in the "millions." (ECF 90-1, ¶ 318.)

Bray has acted as a retirement plan consultant and conducted fiduciary trainings for over twenty years. (Id., ¶ 321.) She has experience with clients that have over a billion dollars in assets, grocery store clients operating in multiple states, and plans with company stock. (Id., ¶ 322.) She routinely conducts RFPs and fee negotiations for her clients and has reviewed numerous RFI responses. (Id., ¶ 323.) More than twenty-five percent of her clients have hired her to conduct multiple RFPs for their plans. (Id., ¶ 324.) She has experience using Fiduciary Reports, Form 5500s, and Plan Fee Reports. (Id., ¶ 325.) By contrast, Defendants' expert, Dylan Mosby, has only ever conducted fiduciary training for one client, has never served on an investment committee or served as a fiduciary for a retirement plan, and had only been involved in one RFP at the time of

his deposition. (ECF 98, ¶¶ 326–328.) Plaintiffs assert that any "shortcomings" in Bray's methodology are no more significant than the shortcomings in Mosby's methodology. (ECF 90-1, ¶¶ 333–35.)

## III.   DEFENDANTS' MOTION TO EXCLUDE

Defendants argue, as a threshold matter, that Bray's testimony should be excluded pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). (ECF 86.) For reasons explained below, the Court concludes that Bray's expert opinions, even if admissible, do not create a genuine dispute of material fact as to whether Defendants breached their fiduciary duties. The Court therefore DENIES AS MOOT the Motion to Exclude.

## IV.   LEGAL ANALYSIS: MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard.

Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual issue exists where the issue "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Plaintiff "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original) (quoting prior version of Fed. R. Civ. P. 56(e)).

### B.   ERISA Breach of Fiduciary Duty Standards.

"ERISA imposes upon fiduciaries twin duties of loyalty and prudence, requiring them to act 'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting 29 U.S.C. § 1104(a)(1)). The prudent person standard is an objective one that "focuses on the fiduciary's conduct preceding the challenged decision." *Id.* (quoting *Roth v.*

17

*Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)). In evaluating a fiduciary's conduct, courts must "focus on the process by which it makes decisions rather than the results of those decisions." *Id.*

When an ERISA breach of fiduciary duty case is based on allegedly excessive fees, the plaintiff must, among other things, provide "'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022) (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). The comparison must be "like-for-like" in the sense that the services provided by the comparator plan must be the same or similar to those provided by the defendant's plan. *See id.* at 279.

   C. *No Reasonable Factfinder Could Conclude that Defendants' Breached Their Fiduciary Duties.*

Although the parties quibble about semantics, the record reflects the following undisputed facts relating to the Plan's recordkeeping fees: (i) Principal provided Plan administration services, including recordkeeping services, throughout the class period; (ii) Principal was qualified to do so; (iii) DeMarche, an independent consultant, provided information and advice to the Committee and Investment Subcommittee throughout the class period about recordkeeping fees and other matters pertinent to the Plan; (iv) the topic of recordkeeping fees was raised repeatedly at Committee and Investment Subcommittee meetings during the class period; (v) Hy-Vee obtained six separate fee benchmarking reports from Fiduciary Decisions between 2018 and 2022, all of which showed Principal's recordkeeping fees to be lower than the benchmark; (vi) the recordkeeping fee as measured in basis points—i.e., as a percentage of assets—went down four times between 2016 and 2022; (vii) the recordkeeping fee as measured in raw dollars per participant fluctuated modestly during the class period but ended up roughly six dollars (or fourteen percent) lower in 2021 than it was in 2016; (viii) the Committee conducted a competitive RFI in 2020 during which nine of ten potential alternatives to Principal for recordkeeping services either chose not to respond at all (usually due to concerns about the complexity of Hy-Vee's Plan) or provided a bid for recordkeeping services that was higher than Principal's; and (ix) Principal ended up essentially matching the pricing offered by the one bidder—Voya—whose bid was lower. These undisputed facts are enough to warrant summary judgment in Defendants' favor.

The Court reaches this conclusion for several reasons. First, and most fundamentally, the record shows the Committee had adequate processes in place to monitor and evaluate the

reasonableness of recordkeeping fees throughout the class period. S*ee Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2023 WL 3092626, at \*11 (M.D. Fla. Apr. 26, 2023) (granting summary judgment where committee "monitored the Plan's recordkeeping fees, conducting three competitive searches for recordkeepers during the Class Period and conducting regular benchmarking exercises in the interim."). The Committee's retention of an outside consultant (DeMarche) for advice, for example, is an important step toward establishing compliance with fiduciary standards. *See, e.g.*, *DeFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) ("Although plainly independent advice is not a whitewash, it does provide evidence of a thorough investigation." (internal citation and punctuation omitted)). The same is true for the fact that the Committee obtained benchmarking reports from Fiduciary Decisions six times over a four-to-five-year period, all of which showed Principal's recordkeeping fees to be reasonable. *See Troudt v. Oracle Corp.*, No. 16-CV-00175-REB-SKC, 2019 WL 1006019, at \*7 (D. Colo. Mar. 1, 2019) (granting summary judgment in part because plan fiduciaries obtained benchmarking data on numerous occasions showing the reasonableness of the administrator's fees).

The record also shows that the Committee was cognizant of the drivers of the recordkeeping fees—including, e.g, the cost of the Retire Secure program—and considered whether the benefits of the program outweighed the costs. *See Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 10 (1st Cir. 2009) (affirming summary judgment for defendant because record showed that it "engaged in a substantively sound, reasonable analysis of all relevant circumstances"); *Laborers Nat. Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313, 322 (5th Cir. 1999) (similar). Moreover, as the Plan grew, the Committee obtained fee reductions (ECF 87-3, p. 396; ECF 87-4, p. 88), which points towards prudence. *See Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014).

Finally, and perhaps most importantly of all, the Committee initiated an extensive RFI process in 2020 to help determine whether there were better alternatives in the marketplace to Principal, ultimately concluding there were not. *See Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 286 (S.D.N.Y. 2018) ("[C]ompetitive bidding is not per se required under ERISA, but it can be an example of an action taken to ensure fees are appropriate."). When these processes are combined with the fact that the Plan's recordkeeping fees went down during the class period on both a percentage and raw dollar basis, there is simply no basis for a reasonable factfinder to conclude that Defendants breached their fiduciary duties. *See id.* at 298 (rejecting breach of fiduciary duty

claim where "recordkeeping fees consistently <u>decreased</u> as [the Plan sponsor] obtained repeated rate reductions"); *see also Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-CV-01493-CCW, 2021 WL 3417843, at \*4 (W.D. Pa. Aug. 3, 2021) (falling fees typically "point[] in the direction of prudence rather than imprudence.").

 <u>Second</u>, Plaintiffs have not identified meaningful benchmarks against which to compare the Plan's recordkeeping fees. Bray identifies four potential comparator plans, but careful review shows that none of them allow for the apples-to-apples comparison required under Eighth Circuit precedent. *See Matousek*, 51 F.4th at 279 ("[T]he key to stating a plausible excessive-fees claim is to make a like-for-like comparison."). All four of her comparators used either Fidelity or Vanguard for recordkeeping services, but both of those companies *declined to even respond to Hy-Vee's RFI* due to their inability to provide the same level of services as Principal. Thus, by definition, the four plans are not suitable comparators because Hy-Vee literally could not have gotten the same services for the same price from those providers. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (comparators were not "equivalent," as required, where plaintiff failed to allege they could provide the same services and tools).

 Moreover, Bray measured the recordkeeping fees charged by those four comparators for only one year out of the seven-year class period and—for three of the four comparators—used a different method for calculating those fees than she did to calculate the fees for the Hy-Vee Plan. For three of the four comparators, she calculated fees on a per-participant basis by dividing total fees by the number of total number of participants (ECF 87-22, pp. 206–21), whereas for Hy-Vee she divided total fees by the number of participants *with account balances* (id., pp. 194–95). The latter number is, by definition, smaller than the former, and thus her numbers are skewed in favor of making Hy-Vee's fees seem higher than those of the comparators. *Cf. Mator v. Wesco Distribution, Inc.*, No. 2:21-CV-00403-MJH, 2021 WL 4523491, at \*7 (W.D. Pa. Oct. 4, 2021) (criticizing plaintiffs' complaint for comparing the cost of the plan's direct and indirect fees against the cost of comparator plans' direct fees, an inappropriate "apples-to-oranges" comparison); *see also Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023) (similar, calling methodology "disingenuous").

 <u>Third</u>, even assuming the four comparators *do* provide a meaningful benchmark, Plaintiffs have not provided enough context on this record to allow a factfinder to conclude that the existence of the four comparators means Principal's recordkeeping fees were actually excessive relative to

the market as a whole. Instead, at most, the factfinder simply knows there are four plans with lower recordkeeping fees. In and of itself, this says very little about the market for recordkeeping fees for large plans like Hy-Vee's. For all we know, Principal's fees may be lower than ninety percent of the market for large plans, and Bray simply identified four outliers. Plaintiffs needed to provide more context to survive summary judgment given the other evidence in the record tending to show that Defendants satisfied their fiduciary responsibilities. *See Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823–24 (8th Cir. 2018) ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice."); *Braden*, 588 F.3d at 596, n.7 ("It is clear that 'nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund.'" (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), *abrogation on other grounds recognized by Hughes v. Nw. Univ.*, 63 F.4th 615 (7th Cir. 2023))).

It is important in this setting to keep in mind the role benchmarks play under Eighth Circuit precedent. The Eighth Circuit has repeatedly held at the motion to dismiss stage that a plaintiff must allege the existence of suitable comparator plans to state a plausible claim for relief. *See, e.g.*, *Matousek*, 51 F.4th at 279; *Meiners*, 898 F.3d at 822. This does not mean, however, that the mere existence of a few suitable comparator plans is automatically enough in and of itself to allow the plaintiff to satisfy the higher summary judgment standard; otherwise, the fiduciaries of only a small handful of 401(k) plans in each category—e.g., the cheapest four or five large plans in the entire country—would be entitled to summary judgment on breach of fiduciary duty claims. In every other case, the plaintiff could simply use those four or five as comparators and thereby avoid judgment as a matter of law. This cannot possibly be the appropriate standard. *See Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1077 n.9 (D. Colo. 2016) (recognizing the "relatively higher burden" the nonmoving party must satisfy on a summary judgment motion vis-à-vis a motion to dismiss).

Stated differently, it is a mathematical reality that some subset of a given class of 401(k) plans will have smaller recordkeeping fees than all the others. It does not follow, however, that all fiduciaries of 401(k) plans that are not in that subset have arguably breached their fiduciary duties to a sufficient degree that requires a trial. *See Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 168 (E.D.N.Y. 2022) (criticizing the implication of plaintiffs' complaint that all plans with over 100 participants and $5 million in assets that charged more than $35 per participant in fees

were unreasonable, because the inquiry is "context-specific, not categorical"). Instead, the Court views the existence of comparator plans as a necessary but not independently sufficient condition for a plaintiff to survive summary judgment. The plaintiff also must produce evidence showing, among other things, where the defendant's plan falls in the market as a whole for similar plans. *See Meiners*, 898 F.3d at 823–24. Plaintiffs here have not done so. Thus, even if the four proffered plans were similar enough to the Hy-Vee Plan to be suitable as comparators under Eighth Circuit precedent, the mere presence of those four plans would not be enough to allow Plaintiffs to withstand summary judgment. If it were, the Court would be greatly oversimplifying the roles fiduciaries play in plan management. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) ("At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."); *see also Nunez v. B. Braun Med., Inc.*, No. CV 20-4195, 2023 WL 5339620, at *11 (E.D. Pa. Aug. 18, 2023) (recognizing that "plan sponsors are 'not going to select the recordkeeper with the lowest fee, absent' considerations about 'services, capabilities, technology, and things of that nature'").

In urging the Court to deny summary judgment, Plaintiffs focus on a handful of issues they believe Defendants handled poorly. Plaintiffs argue, for example, that the Plan should have canceled the Retire Secure program given the program's expense and relatively low utilization. The record shows, however, that the Committee considered the pros and cons of the program, ultimately concluding that the upside (i.e., the ability to educate employees about saving for retirement) justified the increased costs and that the best way to increase utilization was to advertise the program more aggressively. *See Miller v. Packaging Corp. of Am., Inc.*, No. 1:22-CV-271, 2023 WL 2705818, at *5 (W.D. Mich. Mar. 30, 2023) ("It is common sense that a recordkeeper who provides more services per participant will generally charge a higher fee."). This was a reasonable decision for the Committee to make even if, with benefit of hindsight, a different choice arguably would have been better. *See Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (declining to view the fiduciary's actions "from the vantage point of hindsight").

Plaintiffs also have not created a jury question as it relates to the Plan's use of the Wilshire service and corresponding expense. As a preliminary matter, the Wilshire service is not a true "recordkeeping" service; instead, it is an investment advisory service for which Principal simply

passed through the cost. For this reason alone, any deficiency in Defendants' handling of the Wilshire service is not material to a dispute about recordkeeping fees. Moreover, and in any event, it is not unreasonable for a Plan fiduciary to obtain a second (or third) opinion on investment decisions to ensure Plan participants have an appropriate array of options. Finally, the Committee eventually canceled the Wilshire service after, again, evaluating costs and benefits. Even viewing the facts in the light most favorable to Plaintiffs, the record does not show the type of flawed process that would constitute a breach of fiduciary duty. *See, e.g.*, *Nunez*, 2023 WL 5339620, at *10 (holding that a change to more expensive recordkeeper was not imprudent simply because it increased cost, as "the Committee found the small increase in cost justifiable due to what it perceived to be a superior level of service").

Plaintiffs next focus on alleged flaws in the RFI and benchmarking processes. Here, too, their arguments come up short. Although the RFI was not as robust as an RFP, it still produced plenty of information for the Committee to consider when deciding whether Principal's recordkeeping fees and services were reasonable and worth the cost. *See Nunez*, 2023 WL 5339620, at *9 (concluding that RFI contributed to finding of prudent conduct); *Huang*, 2023 WL 3092626, at *11 (same, concluding that RFI and RFP were both relevant). The fact that nine of ten potential alternative recordkeepers either declined to respond to the RFI at all or proposed pricing that was higher than Principal's all but confirms the reasonableness of the Committee's process and Principal's fees, particularly keeping in mind that Principal ended up matching the pricing of the one competitor who offered a lower bid. Meaning, labels aside, the Committee clearly used the process to the benefit of the Plan. *See Johnson v. Providence Health & Servs.*, No. C17-1779-JCC, 2018 WL 1427421, at *7 (W.D. Wash. Mar. 22, 2018) ("Plaintiffs allegation that Defendants failed to competitively bid the recordkeeping is diminished by the fact that Defendants repeatedly renegotiated the agreement to the benefit of the Plan."). Similarly, although Plaintiffs nitpick certain aspects of the Fiduciary Decisions benchmarking process, the fact that the Committee used the process so many times between 2018 and 2022 shows the existence of appropriate processes for monitoring and analyzing the reasonableness of Principal's fees. *See Troudt*, 2019 WL 1006019, at *7–9 (granting summary judgment even though committee did not bid out recordkeeping services because committee regularly considered recordkeeping costs, received benchmarking data, and obtained price concessions from recordkeeper).

Finally, Plaintiffs' arguments about whether Defendants should have considered a different fee structure are not sufficient to withstand summary judgment. The RFI asked respondents to provide fee information on both a flat fee and per-participant basis, thus making clear that the Committee was aware of alternative fee structures. If an alternative fee structure would have been better than the one used by Principal, a reasonably prudent fiduciary would have been justified in expecting the RFI reveal it. The fact that the RFI did *not* result in better bids from other recordkeepers under an alternative structure is therefore telling. A reasonably prudent person would not have felt compelled to go further. Relatedly, and as noted above, Plaintiffs have not provided suitable comparator plans with lower recordkeeping fees anyway, regardless of fee structure. Thus, for numerous reasons, Plaintiffs have not created a triable issue of fact and Defendants are entitled to summary judgment.

## V.      CONCLUSION

No reasonable factfinder could conclude that Defendants breached their fiduciary duties in their handling of recordkeeping fees. The Court therefore GRANTS Defendants' Motion for Summary Judgment. (ECF 87.) The Court DENIES AS MOOT Defendants' Motion to Exclude Plaintiffs' Expert Veronica Bray. (ECF 86.) The Clerk of Court is directed to enter judgment for Defendants.

IT IS SO ORDERED.

Dated: March 7, 2024     _____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE